

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-15-714

| | |
|---|---|
| NEIL TAYLOR NELSON<br>APPELLANT | Opinion Delivered March 2, 2016 |
| V. | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. CR-2013-1934-6] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE MARK LINDSAY, JUDGE |
| | AFFIRMED |

## CLIFF HOOFMAN, Judge

Appellant Neil Taylor Nelson appeals from the Washington County Circuit Court's order denying his motion to transfer his case to the juvenile division or, in the alternative, to extend juvenile jurisdiction. On appeal, Nelson argues that the circuit court erred in denying his motion. We affirm.

On November 19, 2013, Nelson (DOB 11/22/95) was charged as an adult with four counts of raping his eleven-year-old cousin in violation of Arkansas Code Annotated section 5-14-103 (Repl. 2013). On March 19, 2015, Nelson filed a motion to transfer his case to the juvenile division or, in the alternative, to extend juvenile jurisdiction based on the fact that he was seventeen years of age when the offenses were alleged to have been committed.

A juvenile-transfer hearing was held on May 7, 2015. Detective Rick Frisby testified that Mary Rose Morelik, Nelson's step-grandmother, brought her granddaughter, H.M., to the Springdale Police Department in November 2013 because she suspected that H.M. had

been sexually assaulted by Nelson According to Frisby, H.M. disclosed during the interview that Nelson had used a spoon to unlock her bedroom door and had digitally penetrated her. H.M. indicated that her grandparents had been locking her bedroom door in an attempt to protect her from Nelson, who also resided in the home. Frisby testified that a fork with broken tines was found inside the residence, and Morelik informed him that Nelson had used the fork to unlock H.M.'s door. Nelson was interviewed and admitted that he had sexual intercourse with H.M. on four separate occasions. He further admitted that it was his idea and indicated that it was a mistake.

Jeremy Kelly testified that he had been Nelson's probation officer from February 2012 until August 2013. Kelly indicated that Nelson had previously been adjudicated a juvenile delinquent in 2012 based on his commission of several criminal offenses, including theft of property and breaking or entering. Kelly stated that Nelson did not do well on probation initially, and it was revoked. Kelly testified that Nelson then received a second term of probation, which he successfully completed in August 2013. According to Kelly, if Nelson's current case was transferred to the juvenile division, he would not be eligible for any rehabilitative services through the juvenile court because he was older than eighteen years of age. Kelly stated that the only option would be to refer Nelson to the Department of Youth Services (DYS) so that he could be placed in one of two inpatient juvenile detention facilities.

Scott Tanner, the juvenile ombudsman who provides postdispositional advocacy for youth committed to DYS, also testified that Nelson would be limited to two inpatient treatment programs through DYS due to his age. Tanner indicated that these programs

SLIP OPINION

would require a minimum of twelve to fourteen months and that Nelson would then need to undergo a risk assessment or another psychosexual evaluation prior to placement in the community. Tanner stated that all of this treatment would have to be completed by Nelson's twenty-first birthday. Tanner testified that another option would be an extended-juvenile-jurisdiction (EJJ) designation. With that option, Nelson would have the right to a jury trial in the juvenile division. If the allegations were found to be true, Nelson would still have to complete treatment through DYS and then undergo outside treatment, a risk assessment, and another hearing to determine whether he had been rehabilitated. Again, Tanner testified that all of these requirements would have to be completed before Nelson turned twenty-one years old.

Lewanna Hellwig testified that she was Nelson's special-education teacher at Springdale High School. She indicated that Nelson's academic performance was poor and that he read and wrote on a first-grade level. She stated, however, that Nelson did not put forth a lot of effort in her classroom. Hellwig indicated that Nelson was aware of the difference between right and wrong and that he understood that his actions had consequences.

LaDena Eads, the assistant principal in charge of special services, testified that Nelson scored in the extremely low range of functioning on an intelligence test and that he had below-average verbal skills. Eads indicated that Nelson had learning disabilities and that he qualified for an individual-education plan.

Stephen Nichols testified that he is a psychologist and that he had examined Nelson on two occasions to determine his mental status and fitness to proceed in court. Nichols

indicated that Nelson was fit to proceed. In addition, although Nelson had a mental defect in the form of a mild intellectual disability, Nichols testified that Nelson understood the criminality of his conduct and was able to conform his conduct to the requirements of the law. According to Nichols, it was clear that Nelson had the ability to understand the difference between right and wrong.

Susan Moody, Nelson's mother, testified that Nelson was born in the Marshall Islands and that he was premature and weighed only two pounds at birth. Moody stated that Nelson had medical issues and that he was in the hospital on four occasions when he was a baby. Since the family had moved to the United States, Moody testified that Nelson had resided with his grandfather the majority of the time.

Following the hearing, the circuit court entered an order on May 21, 2015, denying Nelson's motion to transfer his case to juvenile court or, in the alternative, to extend juvenile jurisdiction. Nelson filed a timely notice of appeal from this order.

For his sole point on appeal, Nelson argues that the circuit court erred by denying his motion to transfer or for an EJJ designation. Specifically, Nelson contends that the circuit court failed to consider and give appropriate weight to evidence that was admitted concerning his intellectual disability and his educational background.

Pursuant to Arkansas Code Annotated section 9–27–318(c)(1) (Repl. 2015), a prosecuting attorney may charge a juvenile in either the criminal or the juvenile division of circuit court when the case involves a juvenile who is at least sixteen years old when he has engaged in conduct that, if committed by an adult, would be a felony. Upon the motion of

either party, the division of the circuit court in which a delinquency petition or criminal charges have been filed shall conduct a hearing to determine whether to transfer the case to another division. Ark. Code Ann. § 9-27-318(e). The movant has the burden of proving the necessity of a transfer, and the circuit court shall order the case transferred only if it finds by clear and convincing evidence that such a transfer is warranted. *Nichols v. State*, 2015 Ark. App. 397, 466 S.W.3d 431. We will not reverse a circuit court's decision on whether to transfer a case unless it is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

When ruling on a motion to transfer, a circuit court is required to consider and make written findings on all of the following factors set forth in Arkansas Code Annotated section 9-27-318(g):

(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court;
(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;
(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;
(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense;
(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;
(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;
(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday;

(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense;
(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and
(10) Any other factors deemed relevant by the judge.

In addition, when a party has requested an EJJ designation, these same factors are to be considered by the circuit court. Ark. Code Ann. § 9–27–503(c). For an EJJ designation, the movant has the burden to prove by a preponderance of the evidence that such a designation is warranted. Ark. Code Ann. § 9–27–503(b).

Nelson argues that the circuit court failed to appropriately consider the factors found in section 9–27–318(g)(6) and (9) because it did not give sufficient weight to his intellectual disability or educational background. He further argues that the circuit court failed to discuss how his deficits in growth and learning affected his maturity and behavior.

In its written order, the circuit court made the following findings concerning the two statutory factors that Nelson challenges on appeal:

9. That the Defendant has been diagnosed with Intellectual Disability Mild.

10. However, the Defendant is able to plan a crime. He's pled guilty to theft of vehicles twice. He planned sufficiently to get into a high school locker room when the rest of the players were out playing football and knows when and where to look in another student's backpack and get money out of it. That the Defendant is what you might call street smart.

11. That the Defendant is acting like he wants to be an adult. He wants to drive a car. He wants to have money, and he wants to have iPhones. And in this case, he wants to have sex.

15. That the Defendant had early health problems due to a premature birth. However, there is no evidence that these problems were a factor in this case.

16. That the Defendant is of low intelligence and has a mild intellectual disability.

SLIP OPINION

But that the Court believes, based on the evidence at the hearing, that the defendant is street smart and that he is highly capable of planning and carrying out crimes both against persons and property.

With regard to his intellectual disabilities, Nelson contends that the circuit court failed to appropriate any weight to this issue or discuss how it would negatively impact his maturity and his behavior. We disagree. The circuit court specifically recognized that Nelson suffered from an intellectual disability; however, it found from the evidence presented regarding his prior juvenile offenses that he nonetheless had the ability to plan crimes and was "street smart." The court noted that there was no evidence that Nelson's premature birth and health problems as a young child had affected his conduct. The court instead found that Nelson's past actions showed that he wanted to be treated like an adult. All of this evidence was relevant to the factors contained in section 9–27–318(g)(6) and (9), which require that the circuit court consider the juvenile's maturity and sophistication as determined by his environment, pattern of living, and desire to be treated like an adult, in addition to any written reports or other material related to the juvenile's mental, physical, educational, and social history. Thus, contrary to Nelson's argument, the circuit court in this case properly considered the evidence submitted concerning his intellectual disability. While the court stated that it was not placing as great of a weight on subsections (g)(6) and (9) as it was on other statutory factors, the circuit court is not required to give equal weight to each of the factors. *Nichols*, *supra*.

Nelson further argues that the circuit court failed to consider his "educational history as it relates to his intellectual disability and maturity despite there being ample evidence

admitted during the transfer hearing that [he] was a very immature juvenile who was not able to progress in school as other children of the same age were." Specifically, Nelson contends that the circuit court ignored evidence from his school records and from two of his educators.

This argument is also without merit because the evidence from Nelson's school records and from his teachers primarily demonstrated that he had low intellectual functioning. As discussed above, the circuit court did specifically consider and discuss Nelson's intellectual disability as it related to the required statutory factors. Moreover, while Nelson's special-education teacher testified that he was low functioning and was a slow learner, she also indicated that he was aware of the difference between right and wrong and understood that his actions had consequences. To the extent that Nelson is contending that the court failed to place sufficient weight on the evidence that was admitted regarding his educational history, again, the circuit court is not required to weigh each statutory factor equally. *Nichols*, *supra*. Accordingly, Nelson has failed to demonstrate that the circuit court's denial of his motion to transfer or, in the alternative, for extended juvenile jurisdiction was clearly erroneous.

Affirmed.

VAUGHT and BROWN, JJ., agree.

*Toney B. Brasuell*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Valerie Glover Fortner*, Ass't Att'y Gen., for appellee.